**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RACHEL WHITICAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 99 ERW/DDN |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Rachel Whiticar for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the decision of the Administrative Law Judge should be reversed and remanded.

## I. BACKGROUND

Plaintiff Rachel Whiticar, born July 9, 1980, applied for Title II benefits on June 1, 2010. (Tr. 119-20.) She alleged an onset date of disability of March 27, 2010, due to depression, diabetes, fibromyalgia, osteoarthritis, hormonal imbalance, and spinal stenosis. (Tr. 143-54.) Plaintiff's application for Title II benefits was denied initially on August 23, 2010, and she requested a hearing before an ALJ. (Tr. 62-67.)

On January 18, 2012, following a hearing, the ALJ found plaintiff not disabled. (Tr. 10-24.) On November 27, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

## II. MEDICAL HISTORY

From August 12, 2003, to August 23, 2011, plaintiff regularly saw Tim Collins for chiropractic treatment. (Tr. 353-84.)

On August 20, 2009, plaintiff complained of diabetes, feeling overwhelmed, irritable bowel syndrome, anxiety, fibromuscular dysplasia, panic attacks, depression, and poor attention and concentration.[2] She reported working only two days per week and taking Celexa, Lexapro, and Xanax for her mental condition and Ambien and Restoril for sleep. She reported sensitivity to her psychiatric medications. She reported physical abuse from her brother as a child and that her husband worked at a factory. She also reported that she weighed 240 pounds and had been overweight since high school and that she worked in beauty school until she fell and incurred injuries to her back, neck and waist. She regularly saw a chiropractor and wished to avoid pain medication. John Crane, M.D., diagnosed chronic anxiety disorder, irritable bowel syndrome, obesity, and type II diabetes and prescribed Lexapro and Xanax. (Tr. 247-49.)

On September 3, 2009, plaintiff reported that she visited her in-laws in Canada, who tried to pressure her into moving to Canada. Dr. Crane indicated that he and plaintiff discussed her frequent sense of inadequacy. He increased her Lexapro dosage. (Tr. 249.)

On September 28, 2009, plaintiff reported that she had been taking less Xanax. She also reported that she had been learning her new job and informing her employer about her needs. Dr. Crane observed a brighter affect. (Tr. 250.)

On November 12, 2009, plaintiff reported improved mood and that she had maintained her lower Xanax dosage. She indicated concern regarding the upcoming holiday season, which she associated with disappointment and lack of attention during her childhood. She reported better focus and increased interest. She further reported that she received electric stimulation from her chiropractor, which she found painful, and that her chiropractor advised her to discontinue medication and to rely on herbal remedies. Dr. Crane indicated improved affect and mood and advised her to continue her medication regimen. (Tr. 251.)

---

[2] Fibromuscular dysplasia is a disease that leads to narrowing of arteries and hypertension. Stedman's Medical Dictionary, 600 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

On December 11, 2009, plaintiff received lumbar and cervical spine MRIs, which revealed slight wedging at T11-12, due to remote trauma, slight wedging at T10.[3] (Tr. 202-03.)

On February 11, 2010, plaintiff complained of back pain. Dr. Crane noted bone spurs at T10-12 and that she received physical therapy. She had sought the opinions of several physicians for the pain. She reported feeling less motivated as a result. Dr. Crane indicated tenseness and tears. (Tr. 251.)

On February 19, 2011, Mary Walsh-Scott, PT, indicated that plaintiff had attended ten scheduled therapy sessions and responded poorly. Plaintiff reported only temporary pain relief immediately following therapy and that the pain increased in severity at the end of work days. She complained of low thoracic and lumbar pain as well as intermittent leg pain, which she rated as 9 of 10. Mary Walsh-Scott further indicated moderately decreased lower thoracic mobility. She recommended that plaintiff see a specialist and discharged plaintiff. (Tr. 252-53.)

On February 23, 2010, Chris Hemmer, M.D., noted plaintiff's lack of edema and complaints of polyarthralgia.[4] He described plaintiff's gait as normal and opined that she required no medical assistive devices. He diagnosed back pain and polyarthralgia. (Tr. 255.)

On March 4, 2010, plaintiff complained that Lyrica caused drowsiness but alleviated her pain. Dr. Hemmer adjusted her dosage. (Tr. 259.)

On March 22, 2010, plaintiff notified Intervention Pain Care of her intent to resign. She experienced difficulties maintaining her expected patient load due to her health. (Tr. 262-63.)

On April 8, 2010, plaintiff complained of musculoskeletal pain, which Dr. Hennan found consistent with polyarthralgia. She reported improvement with Neurontin and fewer problems with Lyrica.[5] (Tr. 258.)

---

[3] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman at 2117-18.

[4] Polyarthralgia is the simultaneous inflammation of several joints. Stedman at 1533.

[5] Neurontin is used to treat seizures and nerve pain. WebMD, http://www.webmd.com/drugs. Lyrica is used to treat pain caused by nerve damage. Id.

On May 2, 2010, plaintiff saw Umar Daud, M.D., for pain and aches. She complained of pain in the elbows, hips, neck and low back and swelling and stiffness in her hand joints. She reported that her insurance company did not cover Lyrica and that Neurontin helped less and caused her to gain weight. She further complained of depression. She rated her pain as 5-6 of 10. Dr. Daud diagnosed low back pain, myalgia, and arthralgia.[6] He recommended Cymbalta for her mental condition. (Tr. 303-16.)

On May 4, 2010, Dr. Daud found plaintiff's tests negative for ankylosing spondylitis, vasculitis, and muscle inflammation, although he found her C-reactive protein test results mildly high.[7] He diagnosed fibromyalgia and osteoarthritis and recommended that she repeat the testing in two months.[8] (Tr. 264-65.)

On May 19, 2010, plaintiff complained of persistent lumbar and thoracic pain that began two years earlier. She described the pain as burning, sharp, shooting, stabbing, and throbbing and indicated that the pain originated from twisting during a motor vehicle accident. She rated the pain as 6 of 10 and reported that extension, twisting, and walking exacerbated her pain. Mary Campbell found no restriction of motion in plaintiff's lumbar or thoracic spine. She assessed chronic lumbar and thoracic sprain and generalized pain and recommended hormonal lab studies. (Tr. 269-73.)

On June 10, 2010, Mary Campbell found that plaintiff's hormonal lab tests revealed low testosterone, progesterone, and vitamin D and prescribed hormone replacement. She assessed chronic generalized pain. (Tr. 274-75.)

On July 1, 2010, Dr. Collins indicated that plaintiff suffered thoracolumbar degenerative joint disease with canal stenosis and recurrent lumbar and low thoracic strain. He found that plaintiff could mobilize independently. He diagnosed chronic myofascial contractions secondary to active inflammation by facet arthrosis, obesity, type II diabetes, and fibromyalgia.[9] (Tr. 278.)

---

[6] Myalgia is muscle pain. Stedman at 1265. Arthralgia is joint pain. Id. at 159.

[7] C-reactive protein measures general levels of inflammation in the body. WebMD, http://www.webmd.com/a-to-z-guides/c-reactive-protein-crp.

[8] Fibromyalgia is a common syndrome of widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances. Stedman at 725.

[9] Arthrosis is degenerative joint change. Stedman at 162.

Also on July 1, 2010, Christopher Graves, D.O., diagnosed resolved moderate carpal tunnel syndrome in the right arm, obesity, well-controlled type II diabetes, and controlled depression. He noted plaintiff's specialists might support her alleged impairments but opined that plaintiff was not disabled. (Tr. 283.)

On July 6, 2010, Dr. Daud noted that plaintiff repeated the C-reactive protein test, which indicated slightly higher levels. Plaintiff complained of hormone imbalance and increased pain, which she rated as 7 of 10. He found her lumbar range of motion significantly decreased. He diagnosed low back pain, neck pain, and elevated C-reactive protein levels and noted chronic pain, osteoarthritis, and fibromyalgia tender points. He recommended water therapy for weight loss and exercise and prescribed carisoprodol for pain. (Tr. 594-602.)

On July 12, 2010, X-rays of the cervical spine revealed straightening of cervical lordosis, which reflected muscle spasm.[10] X-rays of her lumbar and sacral spine and sacroiliac joints revealed moderate degenerative changes in the low thoracic spine at T10-11. (Tr. 631-35.)

On August 10, 2010, Dr. Scott Williams, M.D., disagreed with plaintiff's progesterone prescription and noted plaintiff's request for human chorionic gonadotropin.[11] (Tr. 577-82.)

Also on August 10, 2010, plaintiff reported that carisoprodol had alleviated only some of her pain and that Dr. Graves started her on Percocet. She requested Lyrica and rated her pain as 8 of 10. Dr. Daud diagnosed fibromyalgia, elevated C-reactive protein levels, and osteoarthritis. He prescribed Lyrica and recommended regular exercise. (Tr. 582-91.)

On August 16, 2010, David Peaco, Ph.D., performed a psychological examination of plaintiff. His examination was limited to questioning plaintiff one time. His essentially two-page report includes no results of psychological testing. She reported to him the following. She received her medical assistant associate degree in 2009 and maintained fulltime employment in the field until March 2010. She reduced her hours to eight hours per week due to pain and lack of stamina. She suffers fibromyalgia, diabetes, osteoarthritis, irritable bowel syndrome, allergies, and asthma. In August 2009, she began receiving mental health treatment, including Lexapro and Xanax prescriptions. She lives with her husband and three-year old son. Recent family deaths, an

---

[10] Lordosis is the anteriorly convex curvature of the vertebral column. Stedman at 1119.

[11] The human chorionic gonadotropin (hCG) test checks for the hormone hCG in blood or urine. WebMD, http://www.webmd.com/baby/human-chorionic-gonadotropin-hcg.

ill grandfather, and chronic pain cause stress. She suffers depression and significant short term memory and concentration problems. She has suffered panic attacks since the mid-1990s three or four times per month. During panic attacks, she experiences shortness of breath, racing heartbeat, muscle tension, restlessness, and fear of losing control. She cares for her son and home and naps daily with her son. Her fatigue limits her ability to perform housework. Her social life is limited. She describes her persistence as mildly impaired, pace as slow, and concentration as moderately impaired. She has no driving difficulties. (Tr. 328-39.)

Dr. Peaco found her level of intellectual functioning above average. He diagnosed recurrent, moderate major depression, and panic disorder without agoraphobia and assessed a GAF of 60.[12] He opined that she could understand and remember simple instructions. He found her persistence and social functioning mildly impaired and concentration moderately impaired. He further found her capacity to function moderately to severely impaired due to her physical health, depression, and panic attacks. (Tr. 329-30.)

On August 23, 2010, Robert Cottone, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff. He found that plaintiff suffered from recurrent, moderate major depression and panic disorder without agoraphobia. He further found to be mild her restriction with daily living activities and difficulties with social functioning. He found her difficulties with concentration, persistence, and pace moderate. He found plaintiff and supporting evidence credible. (Tr. 332-43.)

Also on August 23, 2010, Dr. Cottone submitted a Mental Residual Functional Capacity Assessment regarding plaintiff. He concluded that plaintiff could understand, remember, perform, and persist at simple tasks, make simple work-related decisions, adequately relate to coworkers and supervisors, and adjust adequately to ordinary changes in work routine and setting. (Tr. 344-46.)

---

[12] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000) ("DSM").

On the same day, Tomago Wilson submitted a Physical Residual Functional Capacity Assessment regarding plaintiff. Tomago Wilson found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for about six hours per eight-hour workday, and sit for about six hours. Tomago Wilson found plaintiff's report regarding her daily living activities credible. (Tr. 347-51.)

On September 16, 2010, plaintiff complained of short-term memory loss and worry regarding her husband's increased alcohol consumption and decreased interest. Dr. Crane indicated plaintiff's dramatic affect and inconsistent complaints. (Tr. 394.)

On October 17, 2010, Dr. Daud assessed fibromyalgia, elevated C-reactive protein levels, and neck and low back pain. He again emphasized exercise and noted that it could improve pain. (Tr. 563-70.)

On October 29, 2010, plaintiff saw Ernesto Ruiz-Huidobro, M.D. and complained of asthma exacerbation. Dr. Ruiz-Huidobro indicated that he had not seen plaintiff for three years. He further noted that her asthma symptoms had improved after prior weight loss but had returned with her recent weight gain. She measured 281 pounds and five feet, six inches. He indicated that pulmonary function tests revealed a mild obstructive pattern. (Tr. 814.)

On December 2, 2010, plaintiff complained of difficulty sleeping, exhaustion, and gasping for air upon awaking. She awakens two to four times per night and suffers headaches, fatigue, and impaired memory. Jamie T. Haas, M.D., diagnosed obstructive sleep apnea and recommended a polysomnograph and a C-PAP machine.[13] Brain MRIs revealed no evidence of multiple sclerosis. (Tr. 785-89.)

On December 3, 2010, plaintiff complained of allergic rhinitis and moderate, persistent asthma. Dr. Ruiz-Huidobro noted that plaintiff's asthma symptoms had improved with medication, although she continued to suffer congestion and allergies. He assessed perennial allergic rhinitis, moderate persistent asthma under some control, and hypertrophy of nasal

---

[13] A sleep study or polysomnogram is a test that electronically transmits and records specific physical activities while one sleeps. WebMD, http://www.webmd.com/sleep-disorders/guide/polysomnogram. Continuous positive airway pressure therapy (CPAP) uses a machine to help a person who has obstructive sleep apnea breathe more easily during sleep. WebMD, http://www.webmd.com/sleep-disorders/sleep-apnea/continuous-positive-airway-pressure-cpap-for-obstructive-sleep-apnea .

turbinates.  He continued her on medication and discussed environmental control techniques and allergy immunotherapy.  (Tr. 811-13.)

On January 14, 2011, plaintiff complained of chronic pain.  She reported seeing a new primary care physician, Craig Holmzen, M.D., who had diagnosed her with a partial rupture of her right Achilles tendon and placed her in a boot.  She further reported testing negative for deep vein thrombosis.  Dr. Daud assessed fibromyalgia and elevated C-reactive protein levels.  He indicated that plaintiff suffered low thoracic spine degenerative joint disease and had met with neurosurgery and pain management specialists.  He continued to encourage exercise.  (Tr. 551-63.)

On January 20, 2011, plaintiff informed Dr. Daud of increasing back pain and urinary tract infection.  (Tr. 550-51.)

On February 10, 2011, plaintiff complained of pain in the low and mid back, low legs, hips, knee, ankles, feet, neck, arms, ribs, shoulders, elbows, wrists, and hands, spasms in her back and shoulders, and headaches.  Dr. Krishnan indicated that she had attended physical therapy and received epidural steroid injections, chiropractic care, and lumbar brace.  She indicated that walking, exercising, and carrying exacerbated her mid back pain.  Pain medication, resting, heat, and cold alleviated her pain.  He noted that MRIs indicated thoracic and lumbar spine problems, including disc osteophyte complex without stenosis at T12.  He observed that she walked with a limp and had difficulty performing a heel and toe walk.  He indicated a reduced thoracic and lumbar range of motion.  Fibromyalgia screening results were positive with 18 of 18 points.  He diagnosed myalgia and myositis, carpal tunnel syndrome, thoracic disc displacement or herniation, degeneration of thoracic intervertebral disc, type II diabetes, anxiety, benign hypertension, asthma, and rheumatoid arthritis.  He found her prognosis poor.  He opined that she suffered severe fibromyalgia with thoracic degenerative disc disease.  He instructed her to continue physical therapy and home exercise.  (Tr. 833-838.)

On March 4, 2011, plaintiff complained of persistent nasal congestion, itchy eyes, and shortness of breath.  Dr. Ruiz-Huidobro noted that plaintiff began immunotherapy at low doses and that after the allergy shots, she experienced congestion and some shortness of breath.  He did not expect improvement until the administration of higher doses.  He assessed perennial allergic rhinitis, allergic conjunctivitis, moderate, persistent asthma, fibromyalgia, hormone imbalance,

and vocal cord dysfunction.  He recommended that she continue with her medication and immunotherapy.  (Tr. 811-10.)

On March 9, 2011, plaintiff complained of two weeks of severe myalgia in her arms and difficulty gripping a steering wheel due to pain.  Dr. Haas assessed insomnia, cervical radiculitis, and carpal tunnel syndrome.[14]  He prescribed Lunesta and recommended a cervical spine MRI and nerve conduction velocity test with electomyography.[15]  (Tr. 781-84.)

On April 14, 2011, plaintiff reported that she underwent surgery two weeks ago and that no friends contacted her, which upset her.  She quit her job and felt bad for seeking disability benefits due to her fibromyalgia.  (Tr. 394-95.)

Also on April 14, 2011, plaintiff underwent a nerve conduction velocity test with electromyography, which revealed evidence of mild right carpal tunnel syndrome.  Dr. Haas found to be normal the results regarding her left arm and both legs.  (Tr. 793-99.)

On May 9, 2011, a cervical spine MRI revealed some degeneration at the C1-2 anterior articulation and overall changes of minimal discogenic disease with some early degenerative joint disease.  (Tr. 791-92.)

On May 16, 2011, plaintiff reported receiving a cholecystectomy for gallstones and that Dr. Holzem discontinued Lyrica, Percocet, and carisoprodol.  She further complained of tachycardia and reported that she had not been exercising.  Dr. Daud assessed fibromyalgia, elevated C-reactive protein levels, liver function test abnormality, and arthralgia.  (Tr. 528-41.)

Also on May 16, 2011, plaintiff complained of irregular menstrual cycles, abnormal hair growth, and acne.  Dr. Williams considered polycystic ovarian syndrome and recommended that she continue glucophage.[16]  (Tr. 541.)

---

[14] Radiculitis is the disorder of the spinal nerve roots.  Stedman at 1622.

[15] Lunesta is used to treat insomnia.  WebMD, http://www.webmd.com/drugs.  An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction.  WebMD, http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies.  Nerve conduction studies measure how well and how fast the nerves can send electrical signals.  Id.

[16] Glucophage is used to control high blood sugar for type II diabetes patients.  WebMD, http://www.webmd.com/drugs.

On June 6, 2011, plaintiff complained of a growing right arm lesion. James Jansen, M.D., assessed lipoma. (Tr. 765-67.)

On June 16, 2011, plaintiff continued to complain of pain and had not been exercising. She reported that her primary care physician tested her liver function, which revealed fatty liver and that a skin biopsy revealed angiolipoma.[17] Dr. Daud assessed fibromyalgia, liver function test abnormality, elevated C-reactive protein levels, and connective tissue disease.[18] (Tr. 519-28.)

Also on June 16, 2011, Glenn Sanford, M.D., evaluated plaintiff for diabetes and noted that diabetes blurred her vision. Dr. Sanford's impression was fibromyalgia and myopic astigmatism, which he found controlled with glasses. (Tr. 769-74.)

On June 21, 2011, plaintiff informed Dr. Daud that she went into anaphylactic shock after her allergy shots and taking Plaquenil.[19] (Tr. 518.)

On June 24, 2011, plaintiff complained of allergic rhinitis, asthma, and her allergy shot reaction. Subsequent to her last allergy shot, plaintiff returned home and suffered significant shortness of breath, chest tightness, and cough. Dr. Ruiz-Huidobro recommended discontinuation of the allergy shots and considered Xolair.[20] He diagnosed perennial allergic rhinitis, allergic conjunctivitis, moderate, persistent asthma, and intolerance to immunotherapy. (Tr. 806-08.)

On July 29, 2011, plaintiff received her first Xolair injection. (Tr. 803-04.)

On August 2, 2011, plaintiff complained of pain in the hands and feet and reported that she had not been exercising. Dr. Daud assessed elevated C-reactive protein levels, fibromyalgia, connective tissue disease, and foot and hand pain. Karen H. Gladden, M.D., found X-rays of her hands and left foot unremarkable. Her right foot X-ray revealed minor hallux valgus deformity., which Dr. Gladden found insignificant. (Tr. 396-405, 505-18.)

---

[17] A benign neoplasm of adipose tissues that contains an unusually large a number of dilated vascular channels. Stedman at 87, 1107.

[18] Connective tissue disease refers to a group of disorders involving the protein-rich tissue that supports organs and other parts of the body. Examples of connective tissue are fat, bone, and cartilage. WebMD, http://www.webmd.com/a-to-z-guides/connective-tissue-disease.

[19] Plaquenil is used to treat malaria and certain auto-immune diseases, including lupus and rheumatoid arthritis. WebMD, http://www.webmd.com/drugs.

[20] Xolair is used to treat moderate to severe asthma. WebMD, http://www.webmd.com/drugs.

On August 10, 2011, plaintiff complained of pain, weakness, and insomnia. Dr. Haas assessed insomnia and fibromyalgia and prescribed triazolam.[21] He considered a muscle biopsy and recommended that plaintiff seek evaluation of her myopathic symptoms and elevated C-reactive protein levels. (Tr. 777-80.)

On August 30, 2011, Dr. Collins submitted a Physical Residual Functional Capacity Questionnaire regarding plaintiff. Dr. Collins stated that he saw plaintiff as needed but that he had previously seen her more frequently. He diagnosed fibromyalgia/myositis, facet syndrome, and thoracic and lumbar subluxation and that her condition would not improve without exercise and weight loss. He listed plaintiff's symptoms as chronic thoracic and lumbar pain secondary to facet arthrosis and myofascial contractures. He rated her pain as 7 of 10. According to Dr. Collins, extensions, flexion, and prolonged standing increases her pain. He indicated that depression and anxiety affected her physical condition. He further found plaintiff capable of only low stress jobs because social interactions trigger her anxiety. He found that plaintiff could walk three city blocks without severe pain, sit for twenty continuous minutes, stand for thirty continuous minutes, and sit and stand for only about two hours during an eight-hour workday. He found that plaintiff required 45 minutes of walking per day for five minute periods, that she required unscheduled work breaks every two hours for fifteen minutes, and the option to sit, stand, and walk. He indicated that plaintiff could only rarely lift less than ten pounds, occasionally twist, rarely stoop, bend, and climb stairs, and never crouch or climb ladders. He also found plaintiff significantly limited regarding repetitive reaching and handling, indicating that plaintiff could only use her hands for grasping, turning, and twisting for 10% of the workday, use her fingers for fine manipulations for 35%, and use her arms to reach for 5%. He further indicated that asthma limited her contact with dust, fumes, and gases, and that competition caused stress. (Tr. 385-88.)

On September 22, 2011, Overland Municipal Court suspended plaintiff's driver license for failure to appear or pay for a traffic violation. (Tr. 827.)

On October 12, 2011, W. Clayton Davis, MA, LPC, evaluated plaintiff. Plaintiff reported the following. For ten years after high school, she performed salon and spa work, including facials, waxing, and massages. She worked as a medical assistant after obtaining an associate

---

[21] Triazolam is used to treat insomnia. WebMD, http://www.webmd.com/drugs.

degree in allied health from Sanford Brown in 2009. She last worked in April 2011, where she worked one day per week for Midwest Cardiovascular Consultants. She quit due to fatigue and pain. Her mother's boyfriend molested her at age four or five, and a doctor molested her at age fourteen. She grew up with her mother, older sister, and older brother. Her brother physically abused her, and her mother worked constantly. She stays in contact with her immediate family. She married nine years earlier and has one child, age four. She suffers and receives treatment for low back pain, bulging disc, arthritis, fibromyalgia, asthma, diabetes, and weight difficulties. She has had anxiety since age 13. She receives psychiatric treatment and prescriptions for anxiety and has found counseling helpful. She worries constantly and cannot sleep. She has regular panic attacks, and her last panic attack occurred earlier in the day due to anticipation of today's meeting with W. Clayton Davis. She suffers difficulty sleeping, excessive worry, panic attacks, obsessive counting rituals, flashbacks to past sexual abuse, paranoid thoughts, binge eating, and depressed mood. (Tr. 753-54.)

W. Clayton Davis tested plaintiff, which revealed major depression and no significant memory or concentration impairment. He assessed major depression, anxiety disorder, considered posttraumatic stress disorder, and gave a GAF of 43.[22] He recommended regular counseling sessions to find healthy coping skills for anxiety and that she continue seeking treatment. He opined that plaintiff could not maintain employment due to her physical and mental health. (Tr. 755.)

On October 31, 2011, plaintiff complained of a headache and loud, painful cough. Dr. Ruiz-Huidobro noted that plaintiff did well on Xolair but began coughing one month earlier and received a diagnosis of bronchitis. She received prednisone and Omnicef but continued to cough, which caused difficulty sleeping and chest pain.[23] She further complained of an intense headache. Dr. Ruiz Huidobro assessed perennial allergic rhinitis, allergic conjunctivitis, moderate, persistent

---

[22] A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM at 32-34.

[23] Prednisone is used to treat arthritis, blood disorders, breathing problems, allergies, skin diseases, cancer, eye problems, and immune system disorders. WebMD, http://www.webmd.com/drugs. Omnicef is an antibiotic. Id.

asthma, intolerance to immunotherapy, and acute bronchitis. He prescribed Levaquin and albuterol.[24] (Tr. 800-02.)

On November 17, 2011, Suresha Krishnan, M.D., submitted a Physical Residual Capacity Assessment Questionnaire regarding plaintiff. He had treated her for pain management for only two visits. He diagnosed fibromyalgia and thoracic degenerative disc disease and indicated a poor prognosis. Her symptoms included pain, fatigue, dizziness, anxiety, panic attacks, insomnia, and whole body pain. He noted that the side effects from her medication include dizziness, nausea, and nightmares and that depression and anxiety contribute to her physical condition. He found her incapable of even low stress jobs due to pain that could not be controlled by clinical methods. He found that she could walk only one block, sit for only fifteen minutes at a time, stand for only five minutes at a time, and sit, stand, or walk for less than two hours during an eight-hour workday. He indicated that she needed to walk every fifteen minutes for three minute periods and required the option to sit, stand, or walk. He indicated that she needed three five to ten minute unscheduled breaks per hour. He found that she could only rarely lift ten pounds or less, twist, stoop, bend, or climb stairs, and never crouch or climb ladders. He also found that significant limitations regarding repetitive reaching and handling, indicating that she could grasp, turn, and twist objects and use her fingers for fine manipulations less than 10% of the work day and could never use her arms to reach. He indicated that plaintiff's impairments were likely to result in good and bad days and that she would be absent from work four days per month. (Tr. 829-32.)

**Testimony at the Hearing**

The ALJ conducted a hearing on October 20, 2011. (Tr. 30-57.) Plaintiff testified to the following. She is age 31 and obtained an associate degree in allied health. In 1998, she worked as a cashier at Show-Me, a gas station convenience store, for five or six months. From 1998 to 2000, she worked as an aesthetician in skin care at Body Soul and Spa. She performed similar duties at Salon Identity, Ultimate Hair, and Jazz It Up. She last worked as a medical assistant one day per week in June 2010 for a cardiologist. She also worked for the cardiologist in 2009. She

---

[24] Levaquin is an antibiotic. WebMD, http://www.webmd.com/drugs. Albuterol is used to treat asthma. Id.

resigned because pumping blood pressure cuffs hurt her hands and assisting patients onto scales strained her body. The pain lasted for days and rendered her barely able to move. (Tr. 32-34.)

She measures five feet, six inches and 265 pounds. She has seen Dr. Crane, a psychiatrist since 2009 for a drug reaction, panic, confusion, inability to focus, concentrate, or remember, and excessive crying. She has a four year old son and cares for him at home. Her husband works fulltime as a factory laborer. (Tr. 34-35.)

She has neck pains, mid back spasms, sharp shooting pain, and low back tightness and sore spots. She experiences stiffness in the morning and pain at night. Physical activity exacerbates her pain. She also suffers diabetes, which she controls with medication. She used insulin only during pregnancy. (Tr. 35-36.)

She has also seen Dr. Daud, a rheumatologist, for about a year and a half. Dr. Daud diagnosed fibromyalgia. Fibromyalgia causes difficulty moving and leaving her bed. It also slows her performance of household chores, including washing dishes. It produces aches throughout her body and forces her to sit and take breaks. (Tr. 36-37.)

She has seen Mr. Davis, a counselor, on only one occasion. (Tr. 37.)

Her peak weight was 301 pounds during her pregnancy, but she has been at her current weight for most of her life. Her stomach impedes her physical movements, including lifting laundry baskets, accessing the refrigerator, and preparing meals. She has attempted to lower her weight many times, using LA Weight Loss, Slimfast, Atkins, Weight Watchers, pills, and diet. Her body aches in cold weather. Hot showers result in fever and nausea. (Tr. 37-39.)

She also suffers asthma and takes albuterol, ProAir, and Advair. Secondary smoke or the smell of smoke causes asthma attacks and vomiting. Cleaning solutions, including bleach and ammonia, also cause asthma attacks. She also has difficulty sleeping and awaking. She feels fatigued. (Tr. 39-40.)

She experiences hand pain, particularly with her right hand. Her knuckles swell and inflame, causing her to drop cups and difficulty picking up small objects, including pens or coins. At the hearing, she stood due to back pain. Standing partially relieves pressure on her low back. She can sit at one time for about twenty minutes. When she sits for longer periods, the pain sharpens and may produce spasms and requires a longer rest period. Lying on her side also alleviates the pain. To stand for more than a few minutes, she must lean on some surface such as

a chair, wall, or counter. Without leaning, she can stand for only five minutes. She can walk only one hundred yards without rest. She alternates positions fifteen to twenty times per day. (Tr. 40-42.)

She cannot lift any weight for two-thirds of an eight-hour workday due to the pain in her arms, hands, and back. She could lift only one or two pounds for one-third of an eight-hour workday due to pain in her neck, mid and low back, hips, hands, and forearms. She can climb stairs only slowly due to difficulty lifting her legs and unsteadiness. She also needs to use her hands for support when bending from the sitting position. (Tr. 42-43.)

She sees Dr. Crane for depression, anxiety, and panic attacks. Panic attacks cause chest tightness, diarrhea, vomiting, crying, and nervousness. Her husband transported her to the hearing. On her way to the hearing, she experienced heightened anxiety. They stopped for her to use the bathroom at a convenience store and rest. The traffic added to her anxiety. She dislikes crowded areas because she does not wish to be seen. She has disliked crowds intermittently since puberty, and occasionally, leaving her driveway is difficult. Taking her son to school four blocks from her home causes her difficulty. Occasionally, after entering her vehicle, she must return to her home to rest before she can take him. She also struggles with requesting assistance in stores. She takes Xanax to calm herself. (Tr. 43-46.)

At home, she folds laundry. Her husband launders the clothes and brings them up from the basement. She folds while standing or sitting, and it can take some time. Specifically, the bending, stooping, and reaching causes her difficulty. She cannot maintain her arms in the overhead position nor does she have full overhead extension. At the hearing, she could raise her hands only level with her shoulders. She and her husband shop for groceries. Friends and family rarely visit her home. She dislikes entertaining. Her friends do not understand the pain fibromyalgia causes her, which stresses her relationships. She visits her grandparents once per week. She is comfortable only with familiar people who understand her impairments. Entering a vehicle with strangers causes anxiety and the risk of panic attacks. (Tr. 46-48.)

She worked as an apartment manager for seven or eight months in 2004. As compensation, she did not have to pay $545 in rent. She worked at McDonald's for two weeks. She worked in 1996 at Chauce, hanging clothes, operating the register, and cleaning the store.

She also worked at Katherine's, a gift and flower shop, for about two years, delivering flowers in a vehicle, dusting, operating the register, and arranging flowers. (Tr. 48-49.)

Vocational expert (VE) Delores Gonzalez also testified at the hearing. The ALJ presented a hypothetical individual of plaintiff's age, education, and work experience. The individual could lift and carry twenty pounds only occasionally and ten pounds frequently, stand or walk for six hours during an eight-hour workday, sit for six hours, occasionally climb stairs or ramps, stoop, knee, crouch, and crawl, never climb ropes, ladders, or scaffolds, and must avoid concentrated exposure to fumes, odors, and gases and unprotected heights. Additionally, the individual can understand, remember, and perform at least simple instructions and non-detailed tasks, demonstrate adequate judgment for simple work-related decisions, respond appropriately to supervisors and coworkers, and adapt to routine simple work changes. The VE replied that such individual could perform as a convenience store clerk position, which is light, unskilled work. (Tr. 50-51.)

The ALJ altered the hypothetical individual, stating that such individual could carry ten pounds occasionally and less than ten pounds frequently, stand or walk for two hours, and sit for six hours. The VE replied that such individual could not perform plaintiff's past work but could perform as a food and beverage order clerk, which is sedentary, unskilled work with 227,190 positions nationally and 4,300 positions in Missouri, and as a call-out operator, which is sedentary, unskilled work with 57,220 positions nationally and 610 positions in Missouri. (Tr. 51.)

Plaintiff's counsel altered the ALJ's second hypothetical individual by limiting such individual to two hours sitting and two hours standing or walking. The VE replied that such limitations would preclude the individual from competitive employment. Plaintiff's counsel again altered the ALJ's first hypothetical individual by limiting such individual's ability to understand and remember or carry out simple instructions by more than fifty percent. The VE replied that such limitations would preclude the individual from competitive employment. (Tr. 52-54.)

Plaintiff's counsel presented a hypothetical individual of plaintiff's age, education, and work experience. The individual can sit for twenty minutes at a time, stand for thirty minutes at a time, walk three city blocks without severe pain or rest, needs to walk once every 45 minutes for

five-minute periods, the option to shift positions at will, and fifteen-minute unscheduled breaks every two hours.  Further, the individual can lift and carry less than ten pounds only between one and five percent of the workday and lift no weight occasionally or frequently.  The VE replied that such individual could perform no work due to the number of breaks required.  (Tr. 54-56.)

### III. DECISION OF THE ALJ

On January 18, 2012, the ALJ found plaintiff not disabled.  (Tr. 10-24.)  At Step One of the prescribed regulatory decision-making scheme,[25] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, March 27, 2010.  At Step Two, the ALJ found that plaintiff's severe impairments were fibromyalgia, major depressive disorder, panic disorder, asthma, and degenerative changes of the thoracic and cervical spine. (Tr. 12.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 13.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that she can lift and carry ten pounds occasionally and less than ten pounds frequently, stand and walk for two hours during an eight-hour workday, and sit for six hours.  The ALJ further found that she could occasionally climb stairs or ramps, stoop, kneel, crouch, crawl, never climb ladders, ropes, or scaffolds, and must avoid exposure to unprotected heights, fumes, odors, dust, and gases.  He further found that she could understand, remember, and carry out at least simple instructions and non-detailed tasks, demonstrate adequate judgment for simple work-related decisions, respond appropriately to supervisors and coworkers, and can adapt to routine simple work changes.  At Step Four, the ALJ found that plaintiff could not perform her past relevant work. (Tr. 15-22.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy.  (Tr. 23.)

---

[25] See below for explanation.

# IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

# V.  DISCUSSION

Plaintiff argues that the ALJ erred by (1) failing to afford more weight to the opinion of Dr. Krishnan, (2) failing to consider the opinion of Dr. Collins properly, and (3) failing to consider the opinion of Dr. Peaco properly.

## A.  Dr. Krishnan

Plaintiff argues that the ALJ erred by failing to afford more weight to the opinion of Dr. Krishnan than he did.  "[A] treating physician is normally entitled to great weight."  <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1013 (8th Cir. 2000).  However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  <u>Id.</u>  The ALJ should consider each of the following factors in evaluating medical opinions: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) any other factors brought to the ALJ's attention.  20 C.F.R. § 404.1527(c)(2).  "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."  <u>Davidson v. Astrue</u>, 578 F.3d 838, 843 (8th Cir. 2009).  The ALJ may afford greater or less weight based on the length and frequency of the treatment relationship.  <u>Randolph v. Barnhart</u>, 386 F.3d 835, 840 (8th Cir. 2004).  The ALJ may also disregard opinions to the extent that they are beyond the medical professional's expertise.  <u>Wildman v. Astrue</u>, 596 F.3d 959, 967 (8th Cir. 2010) (citing <u>Brosnahan v. Barnhart</u>, 336 F.3d 671, 676 (8th Cir. 2003)).

The ALJ afforded treating physician Dr. Krishnan's opinion little weight.  (Tr. 20.)  The ALJ made important findings not indicated by the record.  He found that Dr. Krishnan saw plaintiff on only one occasion prior to submitting the opinion questionnaire and that the functional limitations indicated by Dr. Krishnan regarding her ability to sit and stand conflicted with the record.  (<u>Id.</u>)  The ALJ also noted that Dr. Krishnan opined on matters that lay outside of his expertise.  (<u>Id.</u>)  The ALJ also relied on the fact that Dr. Krishnan documented no medical records

at the time he completed the opinion questionnaire and that the questionnaire failed to cite any clinical tests or findings. (<u>Id.</u>) The medical record contradicts the reasons the ALJ demeaned Dr. Krishnan's opinion. Dr. Krishnan treated plaintiff twice prior to the date he completed the questionnaire, including administering several clinical tests, and the questionnaire cites these tests. (Tr. 202-03, 829-38.)

The ALJ's opinion indicates that the ALJ's decision to afford Dr. Krishnan's opinion less than great weight is not supported by substantial evidence. It is of great importance that when considering the opinion of a treating physician, the ALJ give careful and accurate consideration to the factors prescribed by the Commissioner in § 404.1527(c)(2).

## B. Dr. Collins

Plaintiff argues that the ALJ failed to properly consider the opinion of Dr. Collins, her chiropractor. The ALJ may consider evidence from non-acceptable medical sources, including chiropractors, nurse-practitioners, and therapists to determine the severity of impairments and their effect on a claimant's ability to work. 20 C.F.R. § 404.1513(d)(1). And the ALJ must evaluate such sources using the same factors used to evaluate opinions from an acceptable medical source. <u>Titles II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims</u>, SSR 06-03P (2006).

Here, the ALJ discussed the opinion of Dr. Collins in the section of his decision regarding RFC, the effect of a claimant's physical and mental limitations on the ability to work. <u>See</u> 20 C.F.R. § 404.1545(a)(1). The ALJ did not sufficiently discuss the 20 C.F.R. § 404.1527(c) factors, even given that the ALJ noted that Dr. Collins was not an "acceptable medical source. <u>See</u> SSR 06-03P. ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified health care professionals.'"). The ALJ largely discounted Dr. Collins' opinions because he opined on matters outside a chiropractor's expertise. <u>See</u> <u>Wildman</u>, 596 F.3d at 967. Specifically, Dr. Collins opined on anxiety and depression, and a chiropractor's expertise is "with health problems of the musculoskeletal system, which is made up of bones, muscles, ligaments and tendons." (Doc. 16 at 12.) Nevertheless, except for a passing comment that Dr. Collins

"noted the claimant was extremely physically and mentally limited (Exhibit 16F). For example, he noted the claimant could only sit 20 minutes, stand 30 minutes, and walk for five minutes at a time (Exhibit 16F/2-3)," the ALJ did not substantially discuss the reported opinions about which a treating chiropractor would be expert. Further and importantly, the ALJ did not discuss the factors prescribed by § 404.1545(a)(1). Therefore, the ALJ's decision to afford the opinion of Dr. Collins less than great weight as a treating provider is not supported by substantial evidence.

**C. Dr. Peaco**

Plaintiff argues that the ALJ's decision to afford Dr. Peaco's opinion great weight (Tr. 21) contradicts his RFC determination and finding regarding daily living activities. Specifically, plaintiff argues that Dr. Peaco's opinion that plaintiff's "capacity to function effectively with the world around her is moderately to severely impaired" contradicts the ALJ's determination that plaintiff suffers mild limitation with daily living activities and has adequate judgment to make simple work-related decisions, can respond appropriately to supervisors and coworkers, and can adapt to simple work changes.

The opinion of the ALJ does not demonstrate that his strong reliance on Ph.D. psychologist Peaco's opinions is supported by substantial evidence. Dr. Peaco is not a treating provider of plaintiff. The record indicates that his opinions are based upon only his brief, one-time interview of plaintiff, apparently without the benefit of any psychological test results. His entire report is scarcely more than two pages in length. The ALJ did not give sufficient consideration to the factors prescribed by § 404.1527(c)(2).

# VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed under Sentence 4 of 42 U.S.C. § 405(g) and remanded for appropriate consideration of all expert opinions of record in accordance with 20 C.F.R. § 404.1527(c)(2). .

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


_____/S/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 28, 2014 .